# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH E. WELLS, | ) | CASE NO. 1:22-CV-01969-BMB |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BRIDGET M. BRENNAN |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Joseph E. Wells ("Mr. Wells") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Supplemental Security Income ("SSI"). U.S. District Judge Bridget M. Brennan has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.     PROCEDURAL HISTORY

Mr. Wells filed an application for SSI on November 19, 2020, alleging a disability onset date of October 2, 2004. (Tr. 465-71.)[1] His application was denied initially and upon reconsideration. (Tr. 376-79, 381-82.) Mr. Wells requested a hearing before an administrative law judge ("ALJ"). On October 12, 2021, an ALJ held a telephone hearing due to the COVID-19 pandemic, during which Mr. Wells, represented by counsel, and a vocational expert ("VE")

---

[1] The administrative transcript ("Tr.") appears in ECF Doc. 7 on CM/ECF.

testified. (Tr. 13-69.) On October 25, 2021, the ALJ issued a written decision finding Mr. Wells not disabled under the Social Security Act. (Tr. 16-38.) The ALJ's decision became final on September 9, 2022, when the Appeals Council declined further review. (Tr. 1-6.) Mr. Wells filed a Complaint on November 1, 2022, challenging the Commissioner's final decision. (ECF Doc. 1). He raises the following assignments of error:

(1) Whether the ALJ's decision is supported by substantial evidence when the evidence supports a finding that Mr. Wells' severe mental impairments meets the requirements of listings 12.11 and 12.15

(ECF Doc. 8, PageID#1400.)[2]

### III. BACKGROUND INFORMATION[3]

#### A. Personal, Educational, and Vocational Experience

Mr. Wells was born in 1974, and he was 46 years old on his application filing date. (Tr. 37.) He has an eleventh-grade education. (Tr. 47.) He lives with his fiancé and seven-year-old son. (*Id.*)

#### B. Relevant Hearing Testimony

##### 1. Mr. Wells' Testimony

Mr. Wells testified about tasks he completes around the home. While he does not prepare meals, he makes sandwiches. (Tr. 47.) He does laundry but does not wash dishes. (*Id.*) He does not typically grocery shop because it requires standing for long periods of time, and walking through the store hurts his legs. (Tr. 48.)

---

[2] For ease and consistency, record citations to the parties' briefing are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

[3] Because Mr. Wells' assignment of error revolves around his mental impairments and the ALJ's finding at Step Three involving those impairments, summary of the relevant background information will be limited to evidence related to his mental RFC.

Mr. Wells does not take naps and does not have any visitors during the day. (Tr. 49.) He takes Trazodone[4] to sleep at night. (*Id.*) He primarily stays at home unless he has an appointment or event. (*Id.*) He watches television during the day. (*Id.*)

Mr. Wells also testified that he struggles with reading books due to a learning disability. (*Id.*) He can read restaurant menus, but he does not often go to restaurants. (Tr. 49.) If he is trying to locate someone's house, he can read street signs most of the time. (Tr. 50.)

Mr. Wells testified that he has difficulty interacting with people. (Tr. 56.) Specifically, he stated that it is hard for him to trust people. (*Id.*) Due to these trust issues, he testified that he "only…catch[es] the bus." (*Id.*) The ALJ asked Mr. Wells how he would feel if he arrived at an in-person appointment and the waiting room was crowded. (*Id.*) Mr. Wells replied that he would probably try to sit in the waiting room for a minute, and then he would move around or sit close to the wall "or something." (*Id.*) He later testified that he feels nervous or shaky around people. (Tr. 62.) He begins "trying to watch everybody" and cannot concentrate on "what's going on." (*Id.*) Thus, he tries to sit at the front of the bus so he can be more aware of "what's going on." (Tr. 62-63.)

Mr. Wells also stated that he has difficulty with his memory. (Tr. 56.) He explained that he struggles with remembering dates. (Tr. 57.) He also cannot remember things while playing a game because his "concentration just goes somewhere else and [he doesn't] even know what [he] was supposed to be doing." (*Id.*) He plays chess or checkers. (*Id.*). He testified that he typically cannot play a whole game without taking a break, and that he usually does not play more than one or two games. (*Id.*)

---

[4] Trazodone is an anti-depressant medication. *See Trazodone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last visited Oct. 4, 2023).

Mr. Wells also testified that he is currently seeking treatment for mental health symptoms stemming from PTSD. (Tr. 59-60.) He testified that he had been shot in the past and suffers from "very bad night terrors." (Tr. 60.) He also stated that he does not like people to be around him. (*Id.*) He stated that people in his life – including fellow prison inmates – have told him that he does strange, violent things in his sleep. (*Id.*) He testified that his counselor recommended that he speak to somebody "on a higher level than her," so he obtained an evaluation for mental health services. (*Id.*)

Mr. Wells further testified that his mental health symptoms have gotten worse over the past 10 years. (*Id.*) (*Id.*). He also stated that he was angry and described this emotion "as real strange feelings" that he does not understand and that gotten worse. (*Id.*)

Mr. Wells said that, after experiencing nightmares, he wakes up the next morning and still feels kind of sick" if he remembers them. (*See* Tr. 60-61.) When he does not remember his nightmares, he asks people how he behaved when the nightmare occurred. (Tr. 61.) He explained that he recently fell out of bed and hit his head three to five times. (*Id.*) Mr. Wells testified that, on one occasion when he was in prison, he attacked his cellmate while he was sleeping. (*Id.*) He did not remember the attack when he woke up.  (*Id.*)

### 2.  *Vocational Expert's Testimony*

The VE testified that Mr. Wells has no past relevant work. (Tr. 64.) The ALJ first asked whether an individual with Mr. Wells' age and education could perform work at the light exertional level, if limited to occasionally climbing ramps and stairs, but no ladders, ropes, or scaffolding; occasionally balancing, stooping, kneeling, crouching, and crawling; occasionally reaching overhead; no exposure to unprotected heights, hazardous machinery, or commercial driving; performing simple routine repetitive tasks with simple, short instructions; making simple

4

decisions; occasional workplace changes with no fast pace production; and occasional and superficial interaction with coworkers and supervisors, but not interaction with the public and no tandem work. (Tr. 64.) The ALJ additionally noted that this individual could not be required to read instructions, write reports, or do math calculation. (*Id.*) The ALJ also stated that this individual could use a calculator or cash register (instead of doing calculations in his head or on paper) and can read and use a check list (instead of writing paragraphs). (*Id.*) The VE opined that the individual could perform work as a motel/hotel housekeeper, office helper or clerical assistant, and a car wash attendant. (Tr. 65.)

As a second hypothetical, the ALJ asked whether the same individual with the same limitations as the first hypothetical, except limited to the sedentary exertional level, could perform work. (Tr. 65.) The VE opined that this individual could perform work as a document preparer, cutter paster, and tube operator. (Tr. 65-66.)

The ALJ asked the VE whether a hypothetical person would be precluded from work if he was absent about three times a month on an ongoing basis. (Tr. 66.) The VE opined that these absences would be work-preclusive. (*Id.*)

Mr. Wells' counsel asked the VE to consider whether the same individual from either the first or second hypothetical could perform if the individual needed to work in a solitary setting. (Tr. 67.) The VE opined that this would not be consistent with competitive, unskilled work. (*Id.*) Mr. Wells' counsel then asked whether the hypothetical individual could perform work if this individual required at least two extra 15-minute unscheduled breaks per day. (*Id.*) The VE opined that this would be work-preclusive. (*Id.*)

### C.  **Relevant Non-Medical/Medical Opinion Evidence**

#### 1.  *State Agency Psychologists*

In March 2021, Dr. Cynthia Waggoner, Psy.D., reviewed the medical records at the initial level of consideration. Dr. Waggoner opined that Mr. Wells did not meet the criteria for either Listing 12.11 (neurodevelopmental disorders) or Listing 12.15 (trauma and stressor-related disorders). (Tr. 343-44.) Dr. Waggoner further opined that Mr. Wells had only moderate mental limitations in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or mange oneself. (Tr. 344.) Dr. Waggoner also opined that Mr. Wells is able to understand, remember, and carry out simple one to two step instructions on a sustained basis; is capable of performing routine tasks in a solitary setting where he does not have to sustain close consistent attention to detail nor sustain consistent fast-paced performance; and is able to interact with supervisors, co-workers, and the public on an occasional and superficial basis. (Tr. 347.)

In May 2021, Dr. Robyn Murry-Hoffman, Psy.D., reviewed the medical records at the reconsideration level. Dr. Murry-Hoffman concurred with Dr. Waggoner's findings. (Tr. 355-56.)

### 2. Consultative Examining Psychologist

In February 2021, Mr. Wells was referred to Dr. Michael Faust for a psychological evaluation to assess Mr. Wells' mental status and the existence of any psychological condition that would impair his ability to function on a daily basis and in an employment setting. (Tr. 865.) On his Wechsler Adult Intelligence Scale-IV testing, Mr. Wells tested with a verbal comprehension index of 72, a perceptual reasoning index of 69, a working memory index of 83, and a processing speed index of 62, yielding a full-scale IQ of 66. (Tr. 870.) Dr. Faust opined that Mr. Wells' performance placed him within the "extremely low range of ability, which is viewed as mildly lower than expected due to his tendency to give up quickly on tasks that he viewed as challenging."

6

(*Id.*) Based on Mr. Wells' performance, Dr. Faust noted that he believed that Mr. Wade's mental functioning was "within the borderline range of intellectual ability, consistent with his index scores and clinical observations." (*Id.*)

Dr. Faust diagnosed Mr. Wells with the following conditions: post-traumatic stress disorder; borderline intellectual functioning; alcohol use disorder, in sustained remission since 2017; and cannabis use disorder, in sustained remission since 2017. (Tr. 871.)

With respect to Mr. Wells' mental abilities and limitations in understanding, remembering, and carrying out instructions, Dr. Faust opined that Mr. Wells has difficulty understanding instructions due to borderline intellectual functioning. (*Id.*) Dr. Faust also opined that Mr. Wells will likely have additional difficulty with remembering and/or carrying out instructions for task completion due to his continued symptoms of PTSD.

Dr. Faust assessed Mr. Wells' mental abilities and limitations in maintaining attention and concentration, persistence, and pace to perform tasks and to perform multi-step tasks. (Tr. 872.) Dr. Faust observed that Mr. Wells exhibited some difficulty with attention and was quiet, passive, and withdrawn. (*Id.*) Mr. Wells did not show any difficulties tracking the conversation with Dr. Faust but demonstrated some lapses in attention during the mental status testing and interview. (*Id.*) Dr. Faust noted that Mr. Wells remained persistent for mental status tasks but had a slower work pace. (*Id.*). Thus, Dr. Faust concluded that Mr. Wells had some limitations in this area of functioning related to his PTSD. (*Id.*)

Dr. Faust also assessed Mr. Wells' mental abilities and limitations in responding appropriately to supervision and to co-workers in a work setting.  (Tr. 872.) Dr. Faust noted that Mr. Wells presented as passive and anxious during the interview but remained polite and answered all questions. (*Id.*) Mr. Wells exhibited some difficulty interacting due to his "withdrawn and

7

anxious presentation." (*Id.*) Mr. Wells reported some difficulty getting along with others due to hypervigilance, fearfulness, and significant PTSD-related symptoms. (*Id.*) Dr. Faust opined that, due to a combination of borderline intellectual function and symptoms of PTSD, Mr. Wells has some limitations regarding responding appropriately to supervision and to coworkers in a work setting. (*Id.*)

 Dr. Faust then assessed Mr. Wells' mental abilities and limitations in responding appropriately to work pressures in a work setting. (*Id.*) Dr. Faust observed that Mr. Wells presented as "somewhat" withdrawn, depressed, and anxious, but did not present as psychotic. (*Id.*) Thus, Dr. Wells concluded that Mr. Wells had some limitations in this area due to symptoms associated with PTSD and borderline intellectual functioning. (*Id.*)

Finally, Dr. Faust opined that, due to Mr. Well's borderline intellectual functioning, he does not appear to have the ability to manage his own funds. (*Id.*). Thus, Dr. Faust recommended a third-party payee if Mr. Wells was awarded disability benefits. (*Id.*)

### 3.  Mr. Wells' Adult Function Report

Mr. Wells reported that he cannot stand for long periods of time and lift over five pounds. (Tr. 491.) He also reported that his right hand "trembles very badly" and that he suffers from back pain. (*Id.*) He further reported that he suffers from PTSD and nightmares of harming people or people harming him that affects his sleep. (Tr. 491-92.) He indicated that he has no issues with personal care. (Tr. 492-93.) He requires an alarm or someone reminding him to take his medication. (Tr. 493.) He reported that he does not prepare his own meals or complete household chores. (*Id.*)

Mr. Wells further reported that he does not often go outside because he is on house arrest after being released from prison. (Tr. 494.) He indicated that he is able to use public transportation

alone, but he does not drive. (*Id.*). He stated that twice a month he spends two or three hours shopping at stores for clothing and hygiene products. (*Id.*).

Mr. Wells reported he was able to pay bills and count change, but he cannot handle a savings account and use a checkbook/money orders. (*Id.*) He explained that, due to his PTSD, he is unable to "deal with the hassle of" and does not know how to use a savings account. (*Id.*)

Mr. Wells' reported that his hobbies and interests were working on cars, watching TV, listening to music, going for a walk, and sitting on the porch. (Tr. 495.) He said that he does these activities "as often as possible." (*Id.*) However, Mr. Wells indicated that he was unable to go for walks or work on cars due to pain in his legs and shaking in his hands. (*Id.*). With respect to his social activities, Mr. Wells reported that he "often" spends time with others talking and watching movies. (*Id.*) He said he does not require reminders to go places or need people to accompany him. (*Id.*) He indicated that he has problems getting along with family, friends, neighbors, or others because of his PTSD. (*Id.*) He reported that he does not attend family gatherings because he has a "hard time" dealing with people and, due to his PTSD, he is constantly in fear of someone hurting him. (*Id.*)

Finally, Mr. Wells reported difficulties in completing tasks and getting along with others. (Tr. 496.) He indicated he has a short attention span and is unable to finish what he starts. (*Id.*) When asked how well he follows written and spoken instructions, he replied "[n]ot at all." (*Id.*). He also reported that he does not get along with others, including authority figures. (*Id.*). He indicated that he has never worked; thus, he has never been fired or laid off from a job due to problems getting along with other people. (*Id.*). He reported that he does not handle stress well, but he can adjust to changes in his routine. (Tr. 497.) He stated that he has an unusual fear of someone hurting him. (*Id.*)

D. **Relevant Medical Evidence**

On January 28, 2005, Mr. Wells underwent a consultative psychological examination with Dr. Wax. (Tr. 530-35.) Dr. Wax administered the Wechsler Adult Intelligence III testing to Mr. Wells. His full-scale IQ was 73. (Tr. 533.) His working memory was 74. (*Id.*). The wide range achievement test revealed that Mr. Wells was reading and comprehending at a fourth-grade level. (Tr. 534.) Dr. Wax diagnosed Learning Disorder NOS and Malingering. (Tr. 535.)

At a physical examination on July 25, 2017, Mr. Wells' mood, affect, behavior, judgment, and thought content were normal. (Tr. 1237.)

On November 6, 2020, Mr. Wells underwent a diagnostic mental health assessment based on a referral from the Ohio Bureau of Prisons. (Tr. 841-50.) Mr. Wells reported a history of trauma, cannabis, and alcohol use. (Tr. 841.) He reported experiencing shakiness, racing thoughts, constant worry, headaches, muscle tensions, and fatigue. (*Id.*) He also reported that he previously received disability benefits and had been diagnosed with PTSD. (*Id.*) He reported that he does not want to be around other people and has anger management issues. (*Id.*) He further reported "rule breaking behavior" during childhood and adulthood. (*Id.*) He stated that he plays chess, but if something else catches his attention and he looks back at the chess board, he "ha[s] no idea what happened." (Tr. 842.) He reported that his mood will often quickly change to anger. (*Id.*). He reported sleep difficulty, as well as nightmares and terrors with re-occurring dreams. (*Id.*) On examination, Mr. Wells was well groomed and cooperative, with an appropriate affect, happy/relaxed mood, normal speech, and unimpaired memory. (Tr. 842-43.) His mental status examination also indicated that there was no evidence of danger to self and/or others. (Tr. 843.) He was diagnosed with PTSD and alcohol and cannabis use disorders, and the BOP recommended that he participate in individual and group counseling. (Tr. 848-50.)

Mr. Wells presented for a psychological evaluation with Dr. Faust on February 18, 2021. (Tr. 865-72.) Dr. Faust's opinions are discussed at length above.

At an April 2021 medical appointment pertaining to physical complaints, Mr. Wells was observed to be alert and oriented and well groomed, with clear and fluent speech, normal conversation, and a normal affect. (Tr. 1265, 1270, 1288.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Wells had not engaged in substantial gainful activity since November 16, 2020 (the application filing date). (Tr. 18.) The ALJ then found that Mr. Wells had the following severe impairments: degenerative disc disease of the lumbar spine, status-post gunshot wound; degenerative disc disease of the cervical spine; degenerative joint disease of the left hip and bilateral knees; diabetes mellitus; obesity; post-traumatic stress disorder (PTSD); borderline intellectual functioning (BIF); and polysubstance use disorder in remission. (Tr. 19-20.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20-27.)

The ALJ also determined that Mr. Wells could perform work at the light exertional level except with the following mental limitations:

> able to perform simple, routine, repetitive tasks, with simple short instructions; make simple decisions; have occasional workplace changes, but no fast pace production; occasional and superficial[5] interaction with coworkers and supervisors, but no public interaction or tandem work (with superficial meaning the ability to ask and answer simple questions, give or follow simple directions, understand or incorporate simple correction or criticism); no reading instructions, writing reports, math calculations (meaning they are able to complete a checklist or use calculator or cash register, but should not be required to perform math calculations in their head or on paper, but they can read a list and check items off that list).

---

[5] The ALJ defined superficial as the ability to ask and answer simple questions, give or follow simple directions, and understand and incorporate simple correction. (Tr. 64.)

(Tr. 27).

The ALJ next determined that Mr. Wells has no past relevant work and a limited education and, as a result, transferability of job skills is not an issue. (Tr. 37.) Considering Mr. Wells' age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Mr. Wells can perform. (Tr. 37-38.) Accordingly, the ALJ concluded that Mr. Wells was not disabled within the meaning of the Social Security Act since his application filing date. (Tr. 38.)

## V.     LAW & ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

12

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient

evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. Analysis

Mr. Wells raises a single assignment of error: that the ALJ's decision is not supported by substantial evidence because the evidence supports a finding that Mr. Wells' severe mental impairments meet the criteria for Listings 12.11 and 12.15. He asserts two sub-claims: (1) that the ALJ erred in finding that Mr. Wells had only moderate limitations in understanding, remembering, or applying information; and (2) that the ALJ erred in finding that Mr. Wells had only moderate limitations in interacting with others. I recommend that the Court reject Mr. Wells' assignment of error because, although the ALJ erred in determining that Mr. Wells has moderate limitations in interacting with others, the ALJ properly determined that Mr. Wells has only moderate limitations in understanding, remembering, or applying information.

### 1. Legal Standard – Step Three

At Step Three of the sequential disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2001). These listings describe impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Essentially, a claimant who meets the requirements

of a listing, as well as the durational requirement, will be deemed disabled and entitled to benefits. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2011).

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). An ALJ must "compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011). The claimant bears the burden to offer evidence that satisfies all criteria of that listing. *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 817 (6th Cir. 2020). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

"It is important to observe that there is no 'heightened articulation standard' in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings." *Gill v. Colvin*, No. 1:15CV58, 2015 WL 8773885, at *5 (N.D. Ohio Dec. 15, 2015) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). Indeed, "the Sixth Circuit requires only minimal articulation at Step 3 of the sequential analysis." *Gray v. Comm'r of Soc. Sec.*, No. 1:21-cv-0881, 2022 WL 17361659, at *5 (N.D. Ohio Dec. 1, 2022). However, "[i]n order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision." *Reynolds*, 424 F. App'x at 416-17.

"[T]he substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the [administrative] decision is supported by substantial evidence, a reviewing court must affirm." *Gay v. Comm'r of Soc. Sec.*, No. 1:20-cv-180, 2021 WL 855120, at *5 (N.D. Ohio Mar. 8, 2021) (quoting *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281-92 (6th Cir. 2009)) (alterations in original). "[T]he

Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). But "a substantiality of evidence evaluation does not permit a selective reading of the record." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013). Rather, "[s]ubstantiality of the evidence must be based upon the record as a whole." *Id.* (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

### 2. Mr. Wells Did Not Forfeit His Listings Arguments.

The Commissioner argues that Mr. Wells forfeited any arguments related to Listings 12.11 and 12.15 because Mr. Wells and his counsel failed to raise these listings before the ALJ. (ECF Doc. 10, PageID#1420-21.) Thus, the Commissioner contends that Mr. Wells is not entitled to remand. (*Id.* at PageID#1421.) In response, Mr. Wells argues that the case law on which the Commissioner relies is readily distinguishable from the facts here. (ECF Doc. 11, PageID#1428.) Specifically, Mr. Wells contends that the ALJ here did in fact consider Listings 12.11 and 12.15, and Mr. Wells presented evidence that met the listing criteria. (*Id.*) For the following reasons, Mr. Wells has not forfeited his arguments regarding Listings 12.11 and 12.15.

The Commissioner is technically correct that an ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). And the Sixth Circuit has held that a claimant's failure to raise a listing argument before the ALJ means the ALJ is not obligated to specifically address that listing in her conclusion. *Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015); *Walker v. Barnhart*, 72 F. App'x 355, 357 (6th Cir. 2003) (finding that a claimant who did not assert a disability claim under a specific listing was

16

not entitled to an award of benefits under that listing); *Taylor v. Comm'r of Soc. Sec.*, No. 5:22-cv-00079, 2022 WL 17828336, at *4 (N.D. Ohio Oct. 26, 2022) (finding that a claimant failed to preserve the issue of whether she met Listing 14.05 because she did not mention Listing 14.05 to the ALJ, or at any time during her administrative proceeding, despite being represented by counsel), *report and recommendation adopted*, 2022 WL 17663094 (N.D. Ohio Dec. 14, 2022).

But Mr. Wells did not forfeit his Listings argument here because the case law upon which the Commissioner relies does not apply to a situation where, as here, the ALJ *does* address listings that a claimant's counsel did not explicitly raise at the administrative level. Although there appears to be no case law directly on point, *Haines v. Commissioner of Social Security Administration,* No. 5-22-cv-1161, 2023 WL 3990654, at *2 (N.D. Ohio June 14, 2023), is instructive.

In *Haines*, the plaintiff argued that an ALJ's decision was not supported by substantial evidence because the ALJ failed to explain whether the plaintiff's fibromyalgia met or medically equaled a listing. *Id.* at *2. The magistrate judge in *Haines* agreed and recommended that the court vacate and remand the ALJ's decision to the commission. *Id.* The Commissioner filed an objection to the magistrate judge's report and recommendation, arguing that the claimant forfeited her Listing 14.09D argument because she never raised any specific listing before the ALJ. *Id.* The *Haines* court rejected the Commissioner's objection and accepted the report and recommendation based upon its determination, in relevant part, that the plaintiff did not forfeit her right to have her fibromyalgia properly considered at Step Three "simply because her attorney may not have explicitly raised Listing 14.09D during the hearing before the ALJ." *Id.* at *4. Specifically, the district court in *Haines* noted that, despite no "explicit reference to *any* listing by *anyone* during the hearing," the ALJ's final decision addressed several specific listings at Step Three (just not Listing 14.09D). *Id.* (emphasis in original). The claimant, in *Haines* testified at the hearing about

her fibromyalgia and its impact on her daily life, her ability to work, and her medical efforts to deal with it effectively. *Id.* The court held that, even assuming that there had been a forfeiture due to the attorney's failure to mention a specific listing, the Sixth Circuit has recognized that "forfeited issues may in certain circumstances be considered on appeal." *Id.* (citing *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019)).

Here, like *Haines*, there was no explicit reference to *any* listing by *anyone* during the hearing. (*See generally* Tr. 45-69); *Haines*, 2023 WL 3990654, at *4. But the ALJ addressed Listings 12.11 and 12.15. (Tr. 51 ("The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.11 and 12.15.")); *Haines*, 2023 WL 3990654, at *4. Further, Mr. Wells testified about his mental impairment and its impact on his daily life. (*See, e.g.*, Tr. 49 (mentioning that he had a learning disability), 60-63 (testifying about symptoms stemming from his PTSD that impact his sleep).) Considering these facts as a whole, the Commissioner does not demonstrate that Mr. Wells forfeited his Listings arguments "simply because h[is] attorney may not have explicitly raised Listing[s][12.11 and 12.15] during the hearing before the ALJ." *Haines*, 2023 WL 3990654, at *4. Accordingly, I will next address whether the ALJ reasonably determined that Mr. Wells did not meet the criteria of Listings 12.11 and 12.15.

### 3. The ALJ Reasonably Determined that Mr. Wells Had Moderate Limitations in Understanding, Remembering, or Applying Information.

As to Listings 12. 11 and 12.15, Mr. Wells first argues that the ALJ failed to fully and fairly evaluate the evidence when the ALJ concluded that Mr. Wells only has moderate limitations in his ability to understand, remember, or apply information. (ECF Doc. 8, PageID#1410-11.) Specifically, Mr. Wells contends that the ALJ inaccurately reported that the function report indicated that he is able to pay bills, count change, handle a savings account and use a

checkbook/money order. (*Id.* at PageID#411.) He argues that this statement is inconsistent with the record because the function report states that Mr. Wells is unable to handle a savings account or use a checkbook/money order, and Dr. Faust, the consultative psychologist, also determined that Mr. Wells did not appear to have the ability to manage his funds. (*Id.*) Mr. Wells also contends that, while the ALJ noted Mr. Wells' I.Q. score, the ALJ failed to acknowledge that this I.Q. score demonstrates "significantly sub-average general intellectual functioning." (*Id.* (citing Listing 12.05B(1)(a).)

Here, neither party disputes that the ALJ mischaracterized Mr. Wells' ability to manage money. Specifically, the ALJ observed that Mr. Wells "is able to pay bills, count change, handle a savings account, and use a checkbook/money order." (Tr. 22.) While Mr. Wells indicated in his function report that he is able to pay bills and count change, he also reported that he is unable to handle a savings account and use a checkbook/money order due to his PTSD. (Tr. 494.) Despite this mischaracterization, the Commissioner contends that Mr. Wells "overstates the significance of this misstatement," and that item was just one of several data points cited by the ALJ. (ECF Doc. 10, PageID#1424.)

The Commissioner's argument is well-taken because the ALJ's decision offers other valid, substantial evidence to support the conclusion that Mr. Wells has no more than a moderate limitation in this area of functioning. Specifically, the ALJ discussed other reported activities in Mr. Wells' Adult Function Report, such as being able to use public transportation; spending two to three hours shopping in stores for clothes and hygiene products twice a month; and going places with no need for reminders. (Tr. 494-95.) The ALJ observed that Mr. Wells reported to Dr. Faust

that he was able to drive,[6] use public transportation, play card games, and occasionally cook. (Tr. 868, 870.)

The ALJ also determined that Mr. Wells' mental status examination findings "d[id] not support more than a fair or moderate degree of limitation in understanding, remembering, or applying information." (Tr. 22.) Specifically, the ALJ discussed mental status examinations where Mr. Wells displayed relatively benign objective findings, including normal speech, unremarkable thought, and normal mood and affect. (Tr. 22; *see* Tr. 842-43, 868-69, 1270, 1288.) The ALJ finally noted the administrative findings of the state agency psychological consultants, who opined that Mr. Wells has moderate limitations in this area of mental functioning. (Tr. 344, 355.)

In support of his argument that the ALJ should have found a marked limitation in understanding, remembering, or applying information, Mr. Wells contends that the ALJ did not acknowledge that his full-scale IQ score of 66 is indicative of "significantly sub-average general intellectual functioning." (ECF Doc. 8, PageID#1411.) But the ALJ specifically discussed Mr. Wells' full-scale IQ score of 66 and stated that such a score is "consistent with borderline intellectual disability." (Tr. 22; *see* Tr. 870.) Mr. Wells attempts to argue that the ALJ did not fairly evaluate the evidence by intertwining Listing 12.05's criteria.

To the extent Mr. Wells is attempting to raise a Listing 12.05 argument, he does not meet his burden at Step Three because he does not elaborate how he met every criteria for this listing. *Deaner*, 840 F. App'x at 817 ("The claimant bears the burden of offering evidence to establish each element of [a] listing.") (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)). Specifically, Mr. Wells does not point to any evidence beyond his IQ score to support onset before age 22. *See* 20 CFR Pt. 404, Subpt. P, App. 1, §12.05B(3) ("The evidence about your current

---

[6] Mr. Wells stated that his driver's license expired while he was in prison, but he can drive independently. (Tr. 868.)

intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22."). Mr. Wells also fails to establish how a full-scale IQ score of 66 compels a finding of a marked limitation in this area of functioning for Listings 12.11 and 12.15. Finally, the state agency psychological consultants considered Mr. Wells' IQ score, along with other evidence in the record, and concluded that he had moderate limitations in understanding, remembering, and applying information, and that he did not satisfy the criteria of Listings 12.11 and 12.15. (Tr. 343-44, 355.)

The threshold for the sufficiency of substantial evidence is "not high." *Biestek v. Berryhill*, 587 U.S. ---, 139 S.Ct. 1148, 1154 (2019). While Mr. Wells points to evidence that may support a different conclusion, an ALJ's decision cannot be overturned merely because the claimant points to favorable evidence. *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the claimant] must demonstrate that there is no sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion.").

Here, there is substantial evidence in the record to support the ALJ's conclusion that Mr. Wells does not have marked limitations in understanding, remembering, and applying information. An ALJ's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it. *Cutlip*, 25 F.3d at 286. Accordingly, I find that this sub-claim lacks merit.

### 4. The ALJ Did Not Reasonably Determine that Mr. Wells Has Moderate Limitations in Interacting with Others.

Mr. Wells next argues that the ALJ's finding of only moderate limitations in his ability to interact with others is inconsistent with the record and the ALJ's own findings. (ECF Doc. 8,

PageID#1411-12.) In support of this argument, Mr. Wells points to the ALJ's RFC assessment, which found that Mr. Wells could have occasional and superficial interaction with coworkers and supervisors and no public interaction. (*Id.* (citing Tr. 27)) He argues that this demonstrates a "serious limitation in his social functioning." (*Id.* at PageID#1412.)

Mr. Wells also relies on the medical opinions from the state agency psychological consultants (Drs. Waggoner and Murry-Hoffman) to support his argument. (*Id.*). Mr. Wells further notes that Dr. Faust reported that Mr. Wells had difficulty interacting with others due to his withdrawn and anxious representation, and Dr. Faust further opined that Mr. Wells would have limitations responding appropriately to supervision or to coworkers in an employment setting, due to borderline intellectual functioning and symptoms of PTSD. (*Id.* (citing Tr. 872)) Mr. Wells further points to the following state agency psychological consultants' opinions: (1) Dr. Waggoner's opinion that Mr. Wells should work in a solitary setting (Tr. 347); and (2) Dr. Murry-Hoffman's opinion that Mr. Wells is "markedly limited" in his ability to interact appropriately with the general public, and that Mr. Wells will do best in a non-public setting. (Tr. 359-60); (ECF Doc. 8, PageID#1412).

Mr. Wells' reliance on Dr. Faust's opinion to demonstrate inconsistency is misplaced. Specifically, the ALJ observed that Mr. Wells told Dr. Faust that he did not have any difficulties getting along with coworkers and bosses while in prison. (Tr. 866.) Further, Dr. Faust only offered the opinion that Mr. Wells has "some limitations" responding appropriately to supervision to coworkers in an employment setting, due to a combination of borderline intellectual functioning and symptoms of PTSD. (Tr. 872.) This does not clearly establish that Mr. Wells has a marked limitation in this area of functioning.

22

Further, Mr. Wells' reliance on the state agency prior administrative medical findings is misplaced. While Mr. Wells selectively highlights the portions of Dr. Waggoner's and Dr. Murray-Hoffman's opinions discussed above, Mr. Wells overlooks the key fact that both of these state agency psychological consultants concluded that Mr. Wells had only *moderate limitations* in interacting with others. (Tr. 344, 355.)

The ALJ's ultimate RFC assessment does appear, however, to be internally inconsistent with the ALJ's own moderate limitations findings. The Commissioner argues that Mr. Wells offers no case law in support of his conclusion that the ALJ's RFC finding was internally inconsistent, but similarly offers no case law supporting the opposite conclusion. The Social Security Administration regulations provide guidance on how one should assess the category of interacting with others. Specifically, the interacting with others area of mental functioning "refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E2. The regulations describe the following as examples of interacting with others: "cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.*

Here, the ALJ opined that Mr. Wells had the following mental RFC:

> able to perform simple, routine, repetitive tasks, with simple short instructions; make simple decisions; have occasional workplace changes, but no fast pace productions; ***occasional and superficial interaction with coworkers and supervisors, but no public interaction or tandem work (with superficial meaning the ability to ask and answer simple questions, give or follow simple directions, understand or incorporate simple correction or criticism)***; no reading instructions, writing reports, math calculations (meaning they are able to complete a checklist or use calculator or cash register, but should not be required to perform math

calculations in their head or on paper, but they can read a list and check items off that list).

(Tr. 27) (emphasis added).

These limitations are internally inconsistent with the regulations because they reflect marked limitations. *See, e.g., Brewer v. Comm'r of Soc. Sec.*, No. 5:19CV1854, 2021 WL 1214837, at * (N.D. Ohio Mar. 31, 2021) (finding ALJ's moderate limitations finding for interacting with others internally inconsistent with mental RFC limitations of occasional contact with the public, occasional interaction with co-workers, and superficial interaction with others); *Miller v. Colvin*, No. 3:15-CV-294-DW, 2016 WL 154127, at *8-9 (W.D. Ky. Jan. 12, 2016) (finding an RFC that limited the plaintiff to "no interaction with the general public and only occasional, but superficial interaction with co-workers and supervisors combined with no close tandem work" properly accounted for the plaintiff's "marked" limitation in social functioning); *Libertore v. Comm'r of Soc. Sec.*, No. 5:11 CV 1245, 2012 WL 3814522, at *11 (N.D. Ohio July 26, 2012) ("To the contrary, a restriction to jobs without arbitration, confrontation, or negotiation, and further involving only superficial interpersonal interaction with the public or co-workers, is a significant enough limitation to sufficiently accommodate for Claimant's marked social functioning difficulties."), *report and recommendation adopted*, 2012 WL 3815626 (Sept. 4, 2012).

Given the ALJ's contradictory mental RFC limitations, I cannot conclude that the ALJ reasonably concluded that Mr. Wells had moderate limitations in interacting with others. Yet for the reasons set forth above, Mr. Wells has not demonstrated that the ALJ erred in finding he had only moderate limitations in understanding, remembering, and applying information. Because Mr. Wells has not demonstrated marked limitations in two or more areas of functioning, he fails to

demonstrate that he meets the criteria for Listings 12.11 and 12.15. Accordingly, I recommend that the Court reject this assignment of error.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: October 13, 2023                                    s/*Jennifer Dowdell Armstrong*
                                                           Jennifer Dowdell Armstrong
                                                           U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).

Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).